IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| MICHELLE D. CONNELL and HI-TECH BEDS SYSTEMS CORPORATION, a Wyoming corporation<br><br>Plaintiffs,<br><br>   v.<br><br>KLN STEEL PRODUCTS LTD., a Texas limited partnership, KLN STEEL PRODUCTS CO. and CLARK/BLINDERMAN/KNIGHT, LLC, an Illinois limited liability company,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 04 C 194

Judge Virginia M. Kendall

**MEMORANDUM OPINION AND ORDER**

Michelle D. Connell ("Connell") and Hi-Tech Beds Systems Corporation ("Hi-Tech") filed suit against KLN Steel Products, Ltd. ("KLN") and Clark/Blinderman/Knight, LLC ("Clark") alleging patent infringement (Count One), Illinois state law claims of misappropriation of trade secrets (Count Two), unfair competition (Count Three) and interference with prospective business relationships (Count Four) after Clark and the United States Navy awarded contracts for the supply of beds known as "racks" for new recruit barracks at the Great Lakes Naval Base to KLN rather than Hi-Tech. Defendants filed a Motion for Summary Judgment on all of Plaintiffs' claims. This Court held that a dispute of material fact existed as to whether the Navy had authorized and consented under 28 U.S.C. § 1498 to any patent infringement on KLN's part. In that decision, this Court found that the Navy was an indispensable party to the dispute because if the Navy directed the infringement, Defendants were not liable pursuant to 28 U.S.C. § 1498. The Court then transferred

the matter to the Court of Federal Claims. This Court did not consider Defendants' Motion for Summary Judgment on Plaintiffs' state law claims but rather transferred it as well to the Court of Federal Claims.

Plaintiffs appealed that decision to the Federal Circuit, and it reversed. The Federal Circuit relied on its decision in *Fisherman's Harvest, Inc. v. PBS & J*, 490 F.3d 1371 (Fed.Cir. 2007), which was decided while appeal was pending in this case and held for the first time that a court that can not transfer a case to the Court of Claims under 28 U.S.C. § 1404 because the Court of Claims is not a "district or division" as defined therein. The Federal Circuit further held that this Court could not, as an alternative, transfer the case under 28 U.S.C. § 1631, governing transfer for want of jurisdiction, because this Court had jurisdiction. *See Connell v. KLN Steel Prod. Co., Ltd.*, 225 Fed.Appx. 519, *2 (C.A.Fed. 2007). In addition, the Federal Circuit found that the Navy was not an indispensable party to the dispute. *Id*. at *3. The case was remanded to this Court. *Id*.

After the remand, in spite of remaining out of the dispute for four years, the Navy moved to intervene. This Court granted the motion, finding that although the Navy was not an indispensable party, permissive intervention was proper. The Navy then filed a Motion for Summary Judgment on Count One of Plaintiffs' Complaint (patent infringement) arguing that it authorized and consented to any infringement. Defendants joined in the Navy's Motion on Count one and filed a Motion for Summary Judgment on Counts Two (misappropriation of trade secrets), Three (unfair business practices and competition) and Four (interference with prospective business relationships). For the reasons stated below, the Navy's Motion for Summary Judgment is granted and the Defendants' Motions for Summary Judgment are granted in part and denied in part.

## RULE 56 VIOLATIONS

Plaintiffs and Defendants bring several motions to strike. Specifically, Defendants move to strike Plaintiffs' Responses to their Rule 56.1 Statements and Statements of Additional Fact, the Declarations of Michelle Connell, Fred Meyer and David Stinson, and the Expert Report of Dr. Ralph Nash and Plaintiffs move to strike Defendants' Replies to their responses to Defendants' Rule 56.1 Statements of Fact and a related Appendix. The Court will address the Motion to Strike the Expert Report of Dr. Ralph Nash below

As for Defendants' motion, Defendants argue that this Court should strike Plaintiffs' responses to its Rule 56.1 Statements and Statements of Additional Facts because they filed responses that include improper denials, improper citation, and attorney argument and because they filed in excess of 40 Statements of Additional Fact without first seeking leave of this Court.

Local Rule 56.1 allows a party opposing summary judgment to file a response to the movant's Statement of Facts including: 1) a response to each of the movant's statements of fact including specific references to materials relied upon and 2) no more than forty statements of additional facts. L.R. 56.1(3). Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. *Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, at *8 (N.D. Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1). The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)). "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not

consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005).

Accordingly, this Court will not consider portions of the parties' submissions that do not conform to L.R. 56.1. Specifically, this Court has not considered improper argument or improper citations in Plaintiffs' responses to Defendants' Statements of Fact and has considered only the first forty statements of additional fact submitted by Plaintiffs in opposition to each of Defendants' motions for summary judgment.

Defendants also move to strike the Declarations of Michelle Connell, Fred Meyer ("Meyer") and David Stinson ("Stinson"), objecting to various statements therein as irrelevant, hearsay or conclusory. This Court declines to strike the declarations in their entirety, however, it has considered Defendants' objections to the material in its evaluation of the Statements of Fact and note below any significant statements it strikes.

Last, Plaintiffs argue that this Court should strike Defendants' Reply to their Response to Defendant's Statement of Facts and an additional appendix filed with that reply. Because a reply to the non-movant's response to the movant's Statement of Facts is not contemplated by Local Rule 56.1, the motion to strike Defendants' replies is granted. The Court has, however, considered the Appendix to the extent that it related to Defendants' responses to Plaintiffs' additional facts, as defendants are entitled to dispute those facts.

## STATEMENT OF FACTS

Connell is the owner of U.S. Patent No. 6,611,973 entitled BED STRUCTURE WITH STORAGE AREA, which simulates a bed called a "rack" used on Navy ships. Pl. 56.1 at rr; Navy

56.1 at 3-4; KLN 56.1 at 9.[1]  Connell filed her provisional patent application for Hi-Tech's SB-200 bed on May 15, 2001.  KLN 56.1 at 57.  The application was published and became part of the public record on December 19, 2002.  KLN 56.1 at 58.  The patent issued on September 2, 2003.  Navy 56.1 at 10.

KLN is a family-owned limited partnership that sells steel furniture including bunk beds.  KLN 56.1 at 1-2.  KLN has sold furniture to the Great Lakes Naval Base since 1966.  *Id*. at 3.  In 1998 and 1999, it sold thousands of metal beds to the Naval Training Center at the Naval Base.  *Id*.  Clark is a general contractor for large construction projects that contracts with the U.S. Government.  *Id*. at 5.  Hi-Tech is a Wyoming Corporation.  *Id*. at 7.  Hi-Tech and KLN compete in selling bunk beds.  *Id*. at 8.  Both Hi-Tech and KLN attempted to procure contracts to supply beds for the recruit barracks at the Great Lakes Naval Base.

Beginning in 1998, Hi-Tech developed a prototype bed for the recruit barracks with the involvement of the Navy.  In order to design the bed, Hi-Tech first worked with Commander Jay Van Duzer ("Van Duzer") who showed Hi-Tech representative Judith Deming a mock-up ship at the Naval base that contained an example of the type of bed the Navy was looking to place in its barracks.  *Id*. at 26.  As Hi-Tech developed its SB-200 bed, the Navy provided guidance as to what it wanted and Hi-Tech incorporated the Navy's suggestions.  *Id*. at 27.  Although Hi-Tech relied on the Navy to keep the prototype confidential they never entered into a confidentiality agreement.  As

---

[1] Throughout this Opinion, The Navy's Rule 56.1 Statement of Facts in support of its Motion for Summary Judgment on Plaintiffs' claims of patent infringement will be referred to as "Navy 56.1" and Plaintiffs' Statement of Additional Facts in response thereto will be referred to is "Pl. 56.1."  Defendants' Rule 56.1 Statement of Facts in Support of its Motion for Summary Judgment on Plaintiffs' state law claims will be referred to as "KLN 56.1" and Plaintiffs' Response thereto will be referred to as "Pl. 2nd 56.1."

for future sales of the prototype bed, Hi-Tech and the Navy never entered into a design contract for the design of a specific product nor did they sign an exclusivity agreement. *Id*. at 31-32. Hi-Tech was not promised long term sales without competition nor assured of a supply agreement if the prototype performed well. *Id*. at 38, 42. Lieutenant Brian Lindoefer ("Lindoefer") never told Stinson that Hi-Tech would supply the beds if the prototypes performed well. *Id*. at 38, 42. Indeed, under the Federal Acquisition Regulations ("FARS"), Defense Federal Acquisition Regulation Supplement ("DFARS") and the General Services Administration ("GSA"), there is open competition between products offered on the GSA schedule. *Id*. at 32. Similarly, the National Furniture Center for GSA is required to seek maximum competition in meeting the government's requirements. *Id*. at 34. Hi-Tech understood that every contract for beds with the Navy was separate and required an independent bid process. *Id*. at 59**.**

Also in 1998, KLN Salesman Neil Croak ("Croak") began developing a relationship with the Great Lakes Naval Base and eventually learned of the Navy's need for beds for new recruit training buildings. *Id*. at 60. Gene Ignacio, a Navy employee, told Croak that the Navy wanted a bed similar to those on ships. *Id*.

Beginning in 1999, Hi-Tech provided sample bed racks to the Navy. *Id*. at 35. These prototype SB-200 beds were stored in a non-secure warehouse. *Id*. at 37. Although access to the prototype racks was somewhat limited, the beds were not treated by the Navy as "procurement sensitive." *Id*. at 37. "Procurement sensitive" identifies information received by the Navy after requisition for a particular already-developed product and requires that the information remain confidential and not be disseminated publicly. *Id*. at 37. None of the beds that Hi-Tech delivered to the Navy were marked as confidential or as trade secrets. *Id*. at 44, 55. Further, Lieutenant

Daniel Cook ("Cook") reviewed a drawing of the Hi-Tech prototype bed that was not marked confidential. *Id*. at 44. Van Duzer did not recall having any conversations with Hi-Tech about the prototypes being confidential nor were there any marking on the beds themselves indicating that they were confidential. *Id*. at 45. Instead, he recalled that the Navy kept the beds where various recruits could test them and hundreds of people saw them. *Id*. at 45-46.

Numerous individuals saw the prototype beds in a training classroom on the Great Lakes base called the Starr room. *See Id*. at 41, 45-46. The Starr classroom in which the Navy stored the Hi-Tech prototype was occasionally locked to keep recruits from wandering in and out, but generally the Navy allowed access to the room and various persons were shown the bed including a reporter gathering information for an article he was writing about boot camp who later published a photograph of the bed. *Id*. at 39, 40, 43

On August 15, 2000, the Navy issued Request for Proposal ("RFP") N68950-00-R-0227 soliciting bids for the design and construction of two recruit barracks at the Navy's Recruit Training Command ("RTC") in Great Lakes, Illinois. KLN 56.1 at 10. After receiving bids, the Navy awarded the Contract No. N68950-00-C-227 (the "227 contract") for the design and construction of two barracks at the RTC to Clark. *Id*. at 11. The Navy informed Clark that it wanted to add bunk beds to the barracks via a modification or change order to the 227 contract. *Id*. at 13. As such, Clark took proposals from Hi-Tech and KLN for the supply of racks. *Id*. The Navy preferred that the racks be purchased from the GSA schedule. *Id*.

By August of 2001, Clark's interior designer indicated in its furniture package submitted to the Navy that it would supply Hi-Tech's SB-200 bed. Pl. 2nd at f. The Navy was authorized and

prepared to purchase the SB-200 without going through GSA Federal Supply Schedules so long as it was the only such product on the market.   *Id*. at g.

Croak gained access to the prototype with the help of his friend, Navy employee June Huffman ("Huffman"), who had no involvement in the procurement of the beds  Pl. 2nd 56.1 at n, o.  Huffman did not think that the bed was confidential.  KLN 56.1 at 52.  At least one other Navy employee knew that she showed the bed to Croak because he accompanied them to the classroom to see the bed.  *Id*. at 52, 62.  At that point, the bed was in an unguarded room and bore no signs that it was confidential.  *Id*. at 51.  Croak took photographs of the bed and sent them to KLN's engineers who used them to develop a bed.  Pl. 2nd 56.1 at k, l.

KLN's owner, David Ladensohn ("Ladensohn"), sent an email to Neil Croak on September 5, 2001, informing Croak that KLN did not intend to violate any patents in making its beds and that in any case "its really KLN's risk and not the Navy's."  Pl. 56.1 at cc.  Croak contacted persons at the Navy and KLN to inform them that KLN was not trying to copy Hi-Tech's bed but rather could build a better bed at a cheaper price.  *Id*. at dd.  On September 18, 2001, after becoming aware of KLN's efforts, Connell and Meyer wrote a letter to David DeMoske, the Navy's director of acquisition for the Great Lakes Base outlining the facts they knew about KLN's activities that they considered improper.  *Id*. at ee.  Several Navy officers and Steve Maslen ("Maslen") of Clark expressed to Connell or Meyer that any patent issues were a problem between Hi-Tech and KLN and not the Navy.  *Id*. at p (Lindoefer), q (Maslen), r (Lieutenant Bendixon), s (Stringer), t (Merritt), x (Stringer), y (Cook), bb (Navy contracting officer).[2]

---

[2] Defendants argue that these statements should be stricken because they are hearsay. However, the statements are not put forth to prove the truth of the matter asserted but rather to show the state of mind of the Navy and Clark as relevant to whether the Navy authorized and consented

In August or September of 2001, Clark employee Mike Schinzlein told Croak that the Project Committee for the prototype barracks had decided to use Hi-Tech's bed.  Pl. 2nd 56.1 at I.  He said that Hi-Tech's prototype was patent pending and that the Navy did not want to cause any legal issues by seeking the development of a different bed.  *Id*.  Croak wrote in his notes that KLN should not lose interest in the project yet.  *Id*. at j.  In addition, Ladensohn sent an email to Croak stating that KLN had no intention of violating any patents, although he doubted that Hi-Tech had actually filed a patent application.  *Id*.  In any case, Ladensohn stated that "its really KLN's risk and not the Navy's."  *Id*.  During the procurement process for the prototype barracks, around November of 2001, KLN presented a version of the 7301 SSLD bed to the Navy for its evaluation and/or purchase.  KLN 56.1 at 63.  The Navy found that this bed, however, "missed the mark" and chose to order Hi-Tech's bed.  *Id*. at 64.

The solicitation/contract/order for commercial items executed by Hi-Tech on November 27, 2001 informed Hi-Tech that their bid proposal and pricing information relative to the 227 contract would be published on GSA Advantage!, a web site accessible to the public.  KLN 56.1 at 53. Plaintiffs additionally disclosed pricing information on their bed to GSA prior to April 1, 2002.  *Id*. at 54.  On February 28, 2002, the Navy completed "Technical Evaluation Report-Best Value Method of Procurement" for the first two prototype buildings wherein it evaluated both Hi-Tech and KLN's beds.  Pl. 56.1 at ff.  The Navy determined that Hi-Tech's bed was the best value.  *Id*.  The first two barracks, including the beds, were delivered to and accepted by the Navy on or around January 25, 2004 and March 16, 2004, respectively.  Navy 56.1 at 11.

to any patent infringement.

Connell acknowledged that once it was awarded the contract in March of 2002, Hi-Tech's bed would no longer be secret and it would be reasonable for competitors to find out about it. KLN 56.1 at 56. However, when Hi-Tech won the contract to supply beds for the prototype barracks, it entered into an agreement with Clark. Pl. 2nd 56.1 at v. That contract stated, in part:

> Both parties acknowledge and agree because of the proprietary nature of the product being supplied in the purchase order, at no time will CLARK provide to any parties for reasons other than coordination, plans or pricing information related to this purchase order. At no time will CLARK provide any information related to plans or pricing information to any persons or entities that may be a competitor for this type of work.

*Id.*

KLN requested and received a debriefing from the Navy in March of 2002. *Id*. at 66. KLN received feedback as to how it could improve its bed in order to effectively compete in future contracts. *Id*. After the debriefing, KLN representatives were allowed to view Hi-Tech's SB-200 bed. *Id*. at 67. Ladensohn reported to KLN employees that during the testing of their bed, the safety rails broke off easily and their coat hooks failed. Pl. 2nd 56.1 at x. He stated that, since they copied Hi-Tech's hooks, they clearly missed a round of market intelligence. *Id*.

KLN also filed a FOIA request in order to learn about Hi-Tech's beds. Pl. 56.1 at gg. The Navy, however, denied the FOIA request. Pl. 2nd 56.1 at y. KLN received additional input from the Navy regarding the improvement of its 7301 SSLD bed. KLN 56.1 at 68. It used its previous B-1 Bed design as a prototype for a new model. *Id*. Lieutenant Cook and Sam Stringer of the Navy reviewed and worked with KLN's drawings and specifications so that the 7301 SLLD would possess the salient characteristics established by the Navy to improve it for the bid process. *Id*. at 69. As a result, KLN made modifications to its 7301 SSLD and presented the new prototype to Clark and

the Navy with a bid under the 006 contract. *Id*. at 70. At some point, Croak made a second trip to the Navy base to photograph Hi-Tech's beds at KLN's request. Pl. 2nd 56.1 at aa. In addition, John McBrayer, an engineer at KLN, inspected Hi-Tech's bed in the prototype barracks. *Id*. at bb.

On September 27, 2001, the Navy issued RFP No. 68950-01-R-0006 (the "006 RFP") for the construction of training barracks at its RTC in Great Lakes on September 27, 2001. Navy 56.1 at 6; KLN 56.1 at 16. The RFP contained an FAR 52.227-1 "Authorization and Consent" clause. *Id*. The clause stated:

> (a) the Government authorizes and consents to all use and manufacture, in performing this contract, or any subcontract at any tier, of any invention described in and covered by a United States patent (1) embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract or (2) used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with (I) specifications or written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Officer directing the manner of performance. The entire liability to the Government for infringement of a patent of the United States shall be determined solely by the provisions of the indemnity clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.

> (b) The Contractor agrees to include, and require inclusion of, this clause, suitably modified to identify the parties, in all subcontracts at any tier for supplies or services (including construction, architect-engineer services, and materials, supplies, models, samples, and design or testing services expected to exceed the simplified acquisition threshold); however, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, does not affect this authorization and consent.

The Navy awarded the 006 contract to Clark on May 20, 2002. Navy 56.1 at 7. Section E2000 of the 006 contract, addressing movable furnishings for the barracks, stated: "All movable

furnishings shall be purchased from government sources, primarily General Services Administration Federal Supply Schedules, in accordance with the Federal Acquisition Regulations (FAR) Part 8, Required Sources of Supply." *Id*. at 8. According to Section E2000, the government would provide a budget for movable furnishings at a later date which would be determined by summing the cost of the furnishings according to the GSA schedule, a 5% administrative fee, and any shipping charges not included in the GSA price. *Id*. The 006 contract obligated Clark to purchase beds using a best value procurement analysis. Pl. 56.1 at n.

Upon the request of U.S. Navy Director of Acquisitions, David DeMoske, Lieutenant Commander Lindoerfer prepared a list of "salient characteristics" of the desired beds for Clark's use in purchasing racks off of the GSA supply schedules. *Id*. at d. The salient characteristics were prepared in part to ensure that the characteristics of proposed racks did not mirror Hi-Tech's prototype bed and to avoid any liability to Hi-Tech. *Id*. at e. Lindoefer emailed the salient characteristics to Maslen on April 11, 2003. *Id*. at v. He told Maslen that the same characteristics would apply for future barracks, that there were at least two acceptable products on the GSA schedule and that the Navy was looking for the best price. *Id*. at v.

In May of 2003, Clark sent out letters soliciting bid information for presentation to the Navy related to supplying racks for the barracks. KLN 56.1 at 19. Four companies, including Hi-Tech and KLN, submitted bids. *Id*. at 20. Clark compiled pertinent information into a spreadsheet and submitted the proposals and the spreadsheet to the Navy for its review. *Id*. In addition, both Hi-Tech and KLN submitted samples of their respective racks to the Navy. *Id.* at 21. Lieutenant Cook, a member of the committee that evaluated the racks, thought that both KLN and Hi-Tech's racks were acceptable; therefore, the Navy awarded the contract based on pricing. *Id*. at 23.

Clark submitted its request for funding for beds to the Navy based primarily on KLN's proposal. Pl. 56.1 at kk. The final decision as to which furniture, including racks, would be purchased for the recruit training barracks lied with the Navy. On June 27, 2003, the Navy selected KLN to supply the racks and directed Clark to place an order for the racks. KLN 56.1 at 22, 24, 29. On July 3, 2003, Hi-Tech requested a debriefing from the Navy on the decision to award the contract for the beds to KLN. Pl. 56.1 at z. The Navy rejected Hi-Tech's request, but Clark gave Hi-Tech an informal debriefing, noting that the debriefing was not governed by FAR 15.506 and that Clark was not an agent of the Navy. *Id.*

On July 16, 2003, Stringer wrote a letter to Maslen complaining that Clark, in a June 27, 2003 letter to the Navy, was giving the Navy trouble because it made it look like the Navy was expected to choose the provider for the beds for the barracks. Pl. 2nd 56.1 at ff. He asked Maslen to rewrite the letter to state: "based on the above information, Clark determined the bid submitted to KLN to be the overall "best value." *Id.* Maslen refused to change the letter. *Id.* Similarly, on July 22, 2003, Stringer sent Maslen an email stating that "If CLARK had followed the contract requirements in preparing their bid package to the vendors and made the selection as stated in your contract, none of this would have happened . . .Because of the way CLARK handled the procurement it now looks like the Navy had a direct role in the selection process when, in fact, we did not." On August 1, 2003, Lieutenant Sally Merritt denied Hi-Tech's agency protests, noting in her letter that Clark, not the Navy, had decided to purchase the KLN bed. Pl. 2nd 56.1 at jj.

On August 13, 2003, KLN and CLARK entered into a so-called "Subcontract Agreement" for the purchase and installation of KLN beds in the barracks Clark was to deliver to the Navy. Navy 56.1 at 9. That contract made several clauses from the '0006 contract applicable to it,

including the FAR 52.227-1 Authorization and Consent Clause. *Id*. at 9. The Navy issued modifications to the 006 contract allocating funds for the purchase of KLN's beds for the barracks. *Id*.

KLN holds GSA Federal Supply Schedule contracts, GS-27F-2013B and 2014B. *Id*. at 14. The Navy added KLN's 7301SSLD bed to those contracts through Modification P0 35. *Id*. KLN's GSA contracts do not contain authorization and consent provisions. *Id*. They do, however, contain provisions requiring KLN to hold the government harmless for any patent infringement liability. *Id*. KLN's GSA contracts also contain the following language:

> 52.212-4 CONTRACT TERMS AND CONDITIONS- COMMERCIAL ITEMS (MAY 1999)
>
> (q) Other compliances.
> The contractor shall comply with all applicable Federal, State and Local laws, executive orders, rules and regulations applicable to its performance under the contract.

Pl. 56.1 at I.

KLN delivered the first shipment of its Model 7301 SSLD beds to Clark in December of 2003. Navy 56.1 at 10. Clark has also delivered other barracks ordered under the 006 contract and containing KLN beds to the Navy. *Id*. at 11. The Navy is using the KLN beds. *Id*.

Around December of 2005, Clark unilaterally cancelled its option to purchase additional beds from KLN and sent out new RFPs for beds for barracks P-738 and P-739. Pl. 56.1 at ll. The new RFPs specifically required vendors to affirmatively state that their products were free of patent infringement claims. *Id*. During the 2006 procurement, Clark specifically requested that the Navy provide authorization and consent to infringement regarding the beds; the Navy refused. *Id*. at mm.

Clark also requested $300,000 in funding for payment of legal fees in patent infringement suits; the Navy again refused. *Id.*

## Motion to Strike the Expert Declaration of Professor Ralph C. Nash, Jr.

As an initial matter, the Navy and Defendants move to strike the expert declaration of Professor Ralph C. Nash, Jr. ("Nash"), which is cited by Plaintiffs in support of their Statement of Additional Facts relevant to the Motion for Summary Judgment on Count I. Defendants argue that Nash's opinions as to the applicability of the authorization and consent clause to the purchase of the beds at issue is a legal opinion on an ultimate issue and therefore inadmissable. Plaintiffs argue that this opinion goes to a factual issue and will assist the trier of fact in interpreting the relationship of intellectual property to government contracting.

Expert testimony may be admissible if it "will assist the trier of fact to understand the evidence or determine a fact at issue." Fed. R.Evid. 702. Expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible. *See Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (testimony as to whether the city's actions violated the law excluded). Put differently, legal arguments about the meaning of contracts belong in briefs, not expert reports. *RLJCS Enter., Inc. v. Prof'l Benefit Trust Multiple Employer Welfare Benefit Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007) ("argument about the meaning of trust indentures, contracts, and mutual-to-stock conversions belongs in briefs, not 'expert' reports"); *Allison v. Ticor Title Ins.*, 979 F.2d 1187, 1196 (7th Cir. 1992) ("the basic premise that an expert may not testify to the legal significance of a contract is unavoidable"); *See Rumsfeld v. United Tech. Corp.*, 315 F.3d 1361, 1369 (Fed.Cir. 2003) (legal interpretation of regulations belongs in briefing and argument).

Here, Nash offers an unpermitted legal opinion.  Nash's opinion, in relevant part, is that "the Authorization and Consent clause is not applicable to contracts for commercial items obtained from the Federal Supply Schedule."  Nash Rep. at p. 2.  In support of this opinion, Nash provides an analysis of federal acquisition regulations, congressional policy, and GSA regulations - in short, he provides a legal opinion.  Such a legal opinion as to the operation of a contract under the relevant laws is not admissible.[3]  *See*, *e.g.*, *Sparton Corp. v. United States*, 77 Fed. Cl. 1, 9 (2007) (Nash's testimony that solely advised the court on how to interpret regulations and contract provisions excluded as improper legal arguments); *Rumsfeld*, 315 F.3d at 1369 (expert testimony as to the proper interpretation of cost accounting standards irrelevant); *Klaczak v. Consol. Med. Trans.*, 458 F.Supp.2d 622, 636-37 (N.D.Ill. 2006) (expert who construed contract regarding hospital liability excluded because although experts can opine when it addresses a custom or practice as it relates to a contract dispute, an expert may not testify as to how a contract should be construed as a matter of law).

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of fact exists, the Court must view the evidence

---

[3] Nash's opinion is not rendered admissible by his inclusion of two paragraphs noting, without analysis, that the testimony of two witnesses "is consistent with industry practice."  Nash Op. at p. 4.  *Compare*, *WH Smith Hotel Serv., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) (evidence of custom or usage relevant to interpretation of ambiguous contract language so expert testimony addressing at length the usual meaning given to provisions of a real estate lease was admissible); *Sparton*, 77 Fed. Cl. at 9 (Nash's testimony not interpretation of contract terms based on trade practice and any conclusions on trade practice were unsupported).

and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

This Court decides two motions for summary judgment in turn: The Navy's Motion for Summary Judgment on Plaintiffs' claim of patent infringement, and the Defendants' Motion for Summary Judgment on Plaintiffs' state law claims.

## The Navy's Motion for Summary Judgment on Count One of Plaintiffs' Complaint

The Navy moves for summary judgment on Count One of Plaintiffs' Complaint alleging patent infringement against KLN and Clark, arguing that because the Navy authorized and consented to any patent infringement, under 28 U.S.C. § 1498, KLN and Clark are not liable, and Plaintiffs' only remedy lies against the Navy in the Court of Federal Claims. For the reasons stated below, the Motion for Summary Judgment is granted.

## Overview 28 U.S.C. § 1498

Section 1498 provides that:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. . . For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498(a).

The original purpose of § 1498 was "to stimulate contractors to furnish what was needed for the War, without fear of becoming liable themselves for infringements to inventors or the owners or assignees of patents." *Madey v. Duke Univ.*, 413 F. Supp. 2d 601, 606 (M.D.N.C. 2006), *citing Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 345 (1928). The Federal Circuit has noted that the coverage of § 1498 should be broad because Congress intended "to allow the Government to procure whatever it wished regardless of possible patent infringement." *TVI Energy Corp. v. Blane,*, 806 F.2d 1057, 1060 (Fed. Cir. 1986).

In a lawsuit between private parties, one of whom is a government contractor, § 1498(a) can operate as an affirmative defense to liability where the contractors's use of a patented invention is "for the government" and with the "authorization and consent" of the government. *See Madey v. Duke Univ.*, 307 F.3d 1352, 1359 (Fed. Cir. 2002) *citing Crater Corp. v. Lucent Techs., Inc.*, 225 F.3d 1361, 1364 (Fed. Cir. 2001) ("if a patented invention is used or manufactured for the government by a private party, that private party cannot be held liable for patent infringement").

For a contractor to claim the protection of § 1498 as an affirmative defense, the contractor must show that its use was (1) "for the Government" and (2) "with the authorization and consent of the Government." 28 U.S.C. § 1498(a). A use is "with the authorization and consent of the Government" when the Government either expressly or impliedly consents to infringement by the contractor. *See Parker Beach Restoration, Inc. v. U.S.*, 58 Fed. Cl. 126, 132 (2003). As an affirmative defense, the burden is on the party asserting the defense to show the existence of express or implied authorization and consent. *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 507 (7th Cir. 2007) (burden of proof for affirmative defenses falls on the defendant); *Madey*, 413 F. Supp. 2d at 609 (burden of proof for affirmative defense under § 1498 placed on defense).

In reviewing express consent, courts generally rely on clear, express authorization and consent in a government contract. *See, e.g. Parker Beach*, 58 Fed. Cl. at 132 (noting that although not required by the language of § 1498, "the government generally consents and authorizes the use of a particular device by inserting an authorization and consent clause into its contracts"); *Hughes Aircraft Co. v. U.S.*, 534 F.2d 889, 901 (Ct. Cl. 1976). Express consent may be broad, covering any invention or any use, or may be limited only to specific inventions or uses. *See Carrier Corp. v. United States*, 534 F.2d 244, 249 (Ct.Cl. 1976) (noting that the government can limit the scope of its authorization and consent.) The federal procurement regulations, which contain language authorizing and consenting to infringement, show varying degrees of breadth in scope of authorization language. *See* 48 C.F.R. § 52.227-1 (containing several variations of authorization and consent language). By choosing the language of the authorization and consent, "the Government may control the extent of patent infringement it chooses to authorize, and the corresponding liability it chooses to accept." *Madey*, 413 F. Supp. 2d at 608.

When a government contract does not provide express consent, the Government may nonetheless be found to have consented to patent infringement through implied consent. *See TVI Energy Corp.*, 806 F.2d at 1060. Implied consent includes situations where: (I) the government expressly contracted for work to meet certain specifications; (ii) the specifications cannot be met without infringing on a patent; and (iii) the government had some knowledge of the infringement." *Larson v. United States*, 26 Cl. Ct. 365, 370 (1992). Implied consent may also be found through contracting officer instructions, specifications or drawings from the government impliedly sanctioning infringement, or Government intervention in pending infringement litigation. *See Hughes*, 534 F.2d at 901. Any implied consent by the government under § 1498 should be narrowly construed, as it constitutes a waiver of sovereign immunity. *See Madey*, 413 F. Supp. 2d at 609, *citing Parker Beach*, 58 Fed. Cl. at 132-34.

**Express Consent**

This Court first addressed the issue of authorization and consent in its original decision on summary judgment in this matter. The contracts and relevant law remain the same now as they did at the time of this Court's original decision, and as such, this Court's analysis regarding express authorization and consent remains essentially the same.

Defendants argue that because the Navy issued the 006 Modification to the 006 Contract in order to authorize and fund the specific purchase of the KLN beds, the Subcontract Agreement between Clark and KLN to carry out the requirements of the 006 Modification is a subcontract to the 006 Contract. Defendants argue that the language of the Authorization and Consent clause in the 006 Contract, which language is a verbatim copy of 48 C.F.R. § 52.227-1, is sufficiently broad to encompass any infringement that occurs in any product purchased under the 006 Contract, the 006

Modification, and any subcontracts. Therefore, argue Defendants, the Court should read the Authorization and Consent clause in the 006 Contract to mean that the Navy assumed liability for any infringement that took place as a result of the Subcontract Agreement.

Plaintiffs, on the other hand, argue that the Subcontract Agreement is not governed by the Authorization and Consent clause in the 006 Contract. Plaintiffs reason that the plain language of the Section E2000 of the 006 Contract, as well as the language of the 006 Modification, both indicate that the Navy did not consent to infringement through purchase of the beds or any other movable furnishings in the barracks. Because Section E2000 of the 006 Contract specified that movable furnishings would be purchased at a later date "from GSA schedules according to Federal Acquisition Regulations," and because the 006 Modification allocated money to Clark to purchase the KLN bunk beds "in accordance with Section E2000" and "under GSA Contract GS-27F-2013B and GS-27F-2041B," Plaintiffs argue that a genuine issue of fact exists as to whether the Subcontract Agreement operates under the terms of the GSA Contracts rather than the terms of the 006 Contract. The GSA Contracts do not contain an Authorization and Consent clause, so there is no authorization or consent from the Navy to infringe Plaintiffs' patent. Therefore, whether the Navy expressly authorized and consented to patent infringement by Defendants remains disputed.

**Implied Consent**

In its prior decision, this Court found strong yet not dispositive evidence of implied consent. Here, that same strong evidence is present. Specifically, this Court found that the 006 Modification directed Clark to purchase KLN beds and that the Navy accepted delivery of the beds; however, it found that the Navy set forth "salient characteristics" for the necessary beds intended to be generic

enough to avoid patent infringement and that Clark performed the actual analysis of the substance of the different offers for the beds.

In this Motion for Summary Judgment, however, the Court is presented with an additional significant factor and regarding implied authorization and consent: the Navy has by its own accord, intervened in this litigation and filed the Motion for Summary Judgment arguing that it authorized and consented to any infringement. Put another way, the Navy has now specifically asserted to this Court that it provided authorization and consent for any patent infringement. In spite of this Court's concern that the Navy needed to be involved in the earlier stages of this litigation, the Navy chose not to intervene. Now, three years after the Court was first reassigned the matter, the Navy is directly and openly asserting that it authorized and consented to any infringement.

Post Hoc intervention by the government in patent infringement proceedings between private parties supports a finding of implied authorization and consent. *See Hughes*, 534 F.2d at 901 (implied consent may be found through post hoc government intervention in litigation); *Parker Beach*, 58 Fed. Cl. at 134 (government's failure to intervene in infringement litigation resulted in finding of no authorization and consent); *Advanced Software Design Corp. v. Federal Reserve Bank of St. Louis*, No. 4:07CV185CDP, 2007 WL 3352365, at * 7 (E.D.Mo. November 9, 2007) ("the government has now consented post hoc by seeking to intervene on defendants' behalf"). The Navy's intervention in this litigation removes any ambiguity in previously disputed evidence addressed in this Court's prior opinion and constitutes dispositive evidence of implied authorization and consent. *See*, *e.g.*, *Advanced Software Design Corp. v. Federal Reserve Bank of St. Louis*, No. 4:07CV185CDP, 2007 WL 3352365, at * 7 (E.D.Mo. November 9, 2007) (even if other facts did not establish authorization and consent, the government consented by intervening in litigation and

arguing that it provided authorization and consent)  As such, the Navy's Motion for Summary Judgment on Count I of Plaintiffs' Complaint is granted.  Because the Navy authorized and consented to any patent infringement, Plaintiffs' sole remedy under Section 1498 is a suit against the government in the Court of Federal Claims.

## KLN's Motion for Summary Judgment on Plaintiffs' Second, Third and Fourth Counts
## Misappropriation of Trade Secrets

To prevail on a claim of misappropriation of trade secrets under the Illinois Trade Secrets Act ("ITSA"), Plaintiffs must show: 1) the information at issue was a trade secret; 2) it was misappropriated; and 3) it was used in Defendant's business.  *Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003) *citing Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1253, 1265-66 (7th Cir. 1992).  Here, KLN argues that Plaintiffs cannot establish that it violated ITSA because Plaintiffs' bed and information were not kept sufficiently secret to be trade secrets, and even if they were trade secrets, KLN did not misappropriate them.

### *Sufficient Secrecy*

ITSA defines a trade secret as:

> Information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique. Drawing, process, financial data, or list of actual or potential customers or suppliers that:
>
> 1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> 2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).

Due to the second requirement that an individual undertake reasonable efforts to maintain the secrecy of the information at issue, "a plaintiff who takes no affirmative measures to prevent others from using its proprietary information" cannot receive trade secret protection. *Learning Curve*, 342 F.3d at 722 *citing Jackson v. Hammer*, 653 N.E.2d 809, 816 (Ill.App.Ct. 1995). Illinois courts often reference six common law factors in determining whether a trade secret exists: 1) the extent to which the information is known outside the plaintiff's business; 2) the extent to which the information is known by employees and others involved in the plaintiff's business; 3) the extent of measures taken by the plaintiff to guard the secrecy of the information; 4) the value of the information to the plaintiff's business; 5) the amount of time, effort and money expended by the plaintiff in developing the information; and 6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id*.

Whether the actions taken by a plaintiff in protecting the confidentiality of its trade secret satisfy ITSA's "reasonableness" requirement is generally a question of fact. *Id*. at 724. "Only in an extreme case can what is a 'reasonable' precaution be determined [as a matter of law], because the answer depends on a balancing of costs and benefits that will vary from case to case." *Id*. at 725 *quoting Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991). This is not one of those "extreme" situations.[4]

---

[4]In any case, once Hi-Tech filed a patent for its SB-200 bed, the information became public and no longer to trade secret protection. *Rototron Corp. v. Lake Shore Burial Vault Co.*, 712 F.2d 1214, 1215 (7th Cir. 1983) (once a patent is issued, the knowledge is public and is not a protectible trade secret). Therefore, in assessing whether Hi-Tech can support a cause of action for misappropriation of trade secrets, this Court looks only to the status of the beds before the application became part of the public record on December 19, 2002. In addition, KLN argues that Hi-Tech's beds were no longer a trade secret as of March of 2002, when it was awarded the 227 contract. This Court does not find this to be true as a matter of law, however, because Hi-Tech's contract contained a confidentiality clause that prevented CLARK from disclosing the plans to parties for reasons other than coordination or to competitors.

To begin, the fact that Hi-Tech disclosed its bed prototypes to the Navy does not vitiate trade secret protection. A party need not keep a trade secret absolutely secret, and the fact that a trade secret may be disclosed to an outsider for some purpose does not vitiate trade secret protection, even if the outsider is a customer. *See Hotsamba, Inc. v. Caterpillar, Inc.*, No. 01 C 5540, 2004 WL 609797, at * 3-4 (N.D.Ill. March 25, 2004) (computer program remained a trade secret after disclosure to one customer) *citing Rockwell*, 925 F.2d at 177. Nonetheless, the evidence shows that Hi-Tech was not particularly cautious in turning over its prototypes to the Navy. The prototypes turned over to the Navy were not marked as confidential nor kept under lock and key. Specifically, they were kept in a room that was sometimes secured, many people were allowed to see them, and many members of Navy personnel had no idea that they were confidential. To this end, a reporter was allowed to see and photograph them in 2000. [5]

On the other hand, there is no evidence in the record that Hi-Tech disclosed its bed to anyone other than the Navy. *Compare*, *Skoog v. McCray Refrigerator Co.*, 211 F.2d 254, 257 (7th Cir. 1954) ("there can be no confidential disclosure where there has been a prior disclosure to the public without reservation"). Hi-Tech puts forth evidence that it received assurances from the Navy that its prototypes would remain confidential. Specifically, Fred Meyer stated that Hi-Tech provided the beds to the Navy under an assurance of confidentiality, and Hi-Tech produced a demonstration order

---

[5] KLN argues that FAR 15.609 provides guidance to this Court as to what efforts to keep the beds confidential would qualify as "reasonable." FAR 15.609 requires that a specific confidentiality statement be placed on any data submitted to the government as an "unsolicited proposal" if the offeror of that proposal wants to restrict access to that data. 48 C.F.R. 15.609. As such, KLN argues that Hi-Tech should have affixed such a statement to the beds and materials submitted to the Navy if they intended to protect their secrecy. It would have been advisable for Hi-Tech to put such a warning on its materials; however its failure to follow this regulation does not automatically render its efforts to maintain its secrets per se unreasonable. Indeed, no caselaw indicates that failure to do so should result in the grant of summary judgment against Hi-Tech under ITSA.

specifically requesting that any information regarding the beds remain confidential between Hi-Tech and the Navy. Similarly, a confidentiality provision appeared in the 227 contract between Hi-Tech and Clark, and after that contract was issued, the Navy denied KLN's FOIA request for information regarding the beds. Hi-Tech also took affirmative actions to enforce its rights when it thought they were violated. Specifically, when they heard that KLN had viewed and taken pictures of their bed, they immediately complained to the Navy.[6] As such, this Court declines to find as a matter of law that Hi-Tech did not put forth reasonable efforts to protect their trade secret.

### *Misappropriation*

Defendants next argue that this Court should grant summary judgment on Plaintiffs' ITSA claim because it did not misappropriate a trade secret. ITSA defines "misappropriation" as

> 1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> 2) disclosure of use of a trade secret without express or implied consent by another person who:
>
> A) used improper means to acquire knowledge of the trade secret; or
>
> b) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was:
>
> I) derived from or through a person who utilized improper means to acquire it.

---

[6] The fact that Croak was able to gain access to Hi-Tech's bed does not undermine its argument that it took reasonable efforts to protect its intellectual property. *Qsrsoft, Inc. v. Rest. Tech., Inc.*, 06 C 2734, 2006 WL 2990432, at * 9 (N.D.Ill. October 19, 2006) (fact that secret was surreptitiously accessed does not negate the fact that plaintiff took reasonable efforts to protect it).

765 ILCS 1065/2(b).  Put another way, a trade secret is misappropriated if a product developed from it is stolen rather than independently obtained or obtained from a third party source.  *Composite Marine Propellers*, 962 F.2d at 1265-66.

In August or September of 2001, before Hi-Tech's beds were public knowledge, Croak, escorted by a friend who was not involved in the bed procurement, saw and took pictures of Hi-Tech's prototype beds, which he forwarded to KLN engineers.  Soon thereafter, Ladensohn sent an email to Croak addressing the possibility that KLN would infringe on Hi-Tech's patent.  From this evidence, a jury could conclude that Croak surreptitiously viewed Hi-Tech's prototype bed and then endeavored to copy it.  As such, Plaintiffs put forth enough evidence that Croak and KLN acquired the trade secret by improper means or knew that the trade secret was acquired by improper means.

KLN's argument that it used is own design as a basis for the development of the bed and that the original bed it developed after seeing Hi-Tech's design was unsuccessful does not change this conclusion because KLN may have gotten a head start by viewing Hi-Tech's bed.  *See 3M v. Pribyl*, 259 F.3d 587, 598 (7th Cir. 2001) (misappropriation occurred where defendants gained a "head start" in developing their own product by using plaintiffs' trade secret).  Similarly, the fact that KLN's bed was not completely identical to Hi-Tech's does not defeat a claim of misappropriation of a trade secret.  *See Mangren Research and Dev. Corp. v. Nat'l Chem. Co., Corp.*, 87 F.3d 937, 944 (7th Cir. 1996) (trade secret law covers new products substantially derived from trade secrets).

This Court also denies Clark's Motion for Summary Judgment on Plaintiffs' claims of misappropriation of trade secrets.  Plaintiffs told Maslen at Clark of their concerns that KLN had surreptitiously photographed and intended to copy their bed.  As such, Clark could be held liable

under ITSA because it knew or had reason to know that the knowledge of the trade secret was "derived from or through a person who utilized improper means to acquire it."

## Claims under the Illinois Uniform Deceptive Trade Practices Act

The parties agree that Illinois's Deceptive Trade Practices Act codified the common law of unfair competition. *Mars, Inc. v. Curtiss Candy Co.*, 290 N.E.2d 701, 704 (Ill.App.Ct. 1972). Under Illinois's Uniform Deceptive Trade Practices Act:

> (a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:
>
> 1) passes off goods or services as those of another;
>
> 2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods and services;
>
> 3) causes a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods and services;
>
> 4) uses deceptive representations or designations of geographic origin in connection with goods or services;
>
> 5) represents that goods or services have a sponsorship, approval, status, affiliation, or connection he or she does not have;
>
> 6) represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;
>
> 7) represents that goods or services are of a particular standard, quality, or grade or that the goods are a particular style or model, if they are another;
>
> 8) disparages the goods, services, or business of another by false or misleading representation of fact;
>
> 9) advertises goods or services with the intent not to sell them as advertised;

10) advertises goods and services with the intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

12) engages in any other conduct which similarly creates likelihood of confusion or misunderstanding.

815 ILCS 510/2(a).

Plaintiffs have failed to support a finding that Defendants committed any of the acts enumerated in sections (a)(1)-(11) of the act. Section (a)(12) provides flexibility for the act to apply to behaviors not enumerated in Sections (a)(1)-(11), but it still requires that the activity create a likelihood of confusion or misunderstanding among consumers. *See Phillips v. Cox*, 632 N.E.2d 668, 671 (Ill.App.Ct. 1994) (likelihood of confusion necessary for liability under subsection 12); *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 893 N.E.2d 981, 995 (Ill.App.Ct. 2008) (unfair competition "depends upon likelihood of confusion as to the source of plaintiff's goods"). Plaintiffs have failed to provide any facts that could establish that Defendants took actions that could create a likelihood of confusion or misunderstanding among consumers. As such, Defendants' Motion for Summary Judgment on Plaintiffs' claims under the DTPA is granted.

**Interference with prospective economic advantage**

Under Illinois law, in order to establish a claim for tortious interference with prospective economic advantage, a plaintiff must show: 1) a reasonable expectation of entering into a valid business relationship; 2) defendant's knowledge of that expectancy; 3) intentional interference by defendant; and 4) damages. *Kempner Mobile Elec., Inc. v. Southwestern Bell Mobile Systems*, 428

F.3d 706, 716 (7th Cir. 2005).[7] Here, Defendants argue that Plaintiffs cannot establish that they had a reasonable expectation of entering into a business relationship, and Plaintiffs argue, in turn, that the Navy fully intended to purchase Hi-Tech's beds for all of the barracks prior to KLN's interference.

The government has a strong bias toward competition and indeed operates within legal requirements for competition among its contractors. KLN 56.1 at 30. Specifically, under FARS, GFARS and GSA, there is open competition for items offered on GSA schedules. Navy Commander Robert Rawls and Lieutenant Lindoefer both asserted that they never promised long-term sales without competition to Hi-Tech, and there was never a design contract or exclusive relationship between the Navy and Hi-Tech.[8] Plaintiffs provide no evidence that could create a dispute of material fact as to whether they had a reasonable expectation that they would be the provider for all beds required for the recruit barracks at the Great Lakes Base. To the contrary, they admitted in a separate litigation regarding commissions to be paid for sales of the beds that every government contract for the beds required a separate bid process. As such, although Plaintiffs' desired the contracts for the beds and worked toward that goal, the facts do not support that they had a reasonable expectation that they would receive them. *See*, *e.g.*, *Kemmerer v. John D. & Catherine*

---

[7] Defendants argue and Plaintiffs concede that no claim for negligent interference with prospective business relationships exists under Illinois law.

[8] Plaintiffs attempt to dispute these statements, citing to the declarations of Meyer, Connell and Stinson for the proposition that "Navy personnel told Hi-Tech's owner and salesman, and reported to local newspapers, that they intended to continue using the builder and suppliers of the prototype building and furnishings so long as they performed well." These statements, however, are hearsay and therefore are not considered by this Court. It is also worthy of note that Plaintiffs did not submit the newspaper articles in which these statements allegedly appeared, which would have given the statements a greater indicia of reliability. Regardless, these self-serving affidavits, without further support, are not enough to defeat summary judgment.

*MacArthur Found.*, 594 F.Supp.2d 121 122 (N.D.ll. 1984) (desire without unconditional offer to purchase not enough for a reasonable expectancy).

For the reasons stated above, this Court grants the Navy's Motion for Summary Judgment on Count One as joined by Defendants; grants in part and denies in part Defendants' Motion for Summary Judgment; grants Defendants' Motion to Strike the Expert Opinion of Dr. Ralph Nash as joined by Defendants, grants in part and denies in part Defendants' Motion to Strike Plaintiffs' Response to their Rule 56.1 Statement and Statements of Additional Fact; grants in part and denies in part Defendants' Motion to Strike the Declarations of Michelle Connell, Fred Meyer and David Stinson; and grants in part and denies in part Plaintiffs' Motion to Strike Defendants' Reply to its Response to their Statements of Fact.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: March 16, 2009